**Dean E. Johnson  [CSBN 114065]**
**600 Allerton Street, Suite 202**
**Redwood City, CA  94063**
**Phone:  (650) 216-7155**
**Fax:  (650) 216-7355**

Attorney for Defendant
BENJAMIN ROBINSON

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA
## SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> BENJAMIN ROBINSON, <br><br> Defendant. | No. CR-07-00596 JF <br><br> **DECLARATION OF COUNSEL IN SUPPORT OF MOTION FOR DISCLOSURE OF GRAND JURY PROCEEDINGS** <br><br> Date:  December 19, 2007 <br> Time:  9:00 AM |

I, Dean E. Johnson, declare:

1) I am an attorney duly admitted to practice before this Court.  I represent Defendant Benjamin Robinson in this action.

### Introduction

2) The following overview of the facts of the case is derived from the administrative and investigative reports prepared by the government in this matter, from documents produced thus far in discovery, and from information obtained from defendant's independent investigation of the matter.  Accordingly, these facts are set forth on information and belief.

### Background

3) During the time of the events that give rise to the indictment, Benjamin Robinson was a Special Agent with the Officer of Export Enforcement (OEE).

-1-

4) OEE is an agency of the United States Department of Commerce. Among other things, OEE investigates potential violations of Federal export regulations, particularly those involving "dual-use technologies." "Dual-use technologies" are technologies that have both civilian and military applications.

5) Prior to the events that give rise to the present case, Mr. Robinson had served with distinction as a federal investigator. Virtually his entire working life had been spent in Federal service. He had been awarded the Gold Medal, which is the highest commendation that the Department of Commerce gives for exceptional service. He had also been selected to provide protection for the President of the United States during President Clinton's visit to the Bay Area.

### Mr. Robinson's Encounter with "S.S."

6) In November of 2002, Mr. Robinson had a chance meeting with the woman described in the indictment as "S.S."

7) The meeting occurred in the lobby of the building where Mr. Robinson worked as an OEE investigator. That building also houses the local office of the Equal Employment Opportunity Commission (EEOC).

8) S.S. claimed that she needed assistance in filing a complaint with EEOC. Mr. Robinson had been an investigator with EEOC before he joined OEE. He volunteered to help S.S.

9) Eventually, Mr. Robinson and S.S. developed a social relationship.

10) During early days of the relationship, S.S. told Mr. Robinson that she was a native of Iran, but claimed to be a United States citizen. She revealed that her surname (which happens to be the most common surname in the English speaking world) was, in fact, her married name. She also told Mr. Robinson that she was separated from her husband and that she was in the process of obtaining a divorce.

11) Eventually, the relationship became romantic. In January, 2003, S.S. invited Mr. Robinson to her home, where the couple had sexual intercourse for the first time.

12) On or about February 14, 2003, S.S. again invited Mr. Robinson to her home. The couple had intercourse for the second time.

13) At this point, the relationship took a bizarre turn.

14) Immediately after she and Mr. Robinson had intercourse, S.S. claimed that she was pregnant, and that she knew that Mr. Robinson was the father of the child.

15) Mr. Robinson responded that, if S.S. was indeed pregnant, and if she could show that Mr. Robinson was the father of the child, he would acknowledge the child as his and provide support for it.

16) In March, 2003, S.S. informed Mr. Robinson that she intended to go to Iran to give birth to the baby.

17) S.S. did not offer any explanation as to why a United States citizen, who was resident in the United States, would prefer to have a child in Iran.

18) S.S. demanded that, prior to her departure for Iran, Mr. Robinson provide her with his identifying information, including his birth certificate, passport, social security number and a notarized letter over his signature.

19) As an OEE agent, Mr. Robinson has responsibility for the investigation of the export of technology that has military as well as civilian applications.

20) As an OEE agent, Mr. Robinson's clearance level was "TOP SECRET."

21) Because of S.S.'s bizarre demands, Mr. Robinson became concerned that S.S. was a fraud and that she intended to use his identifying information for an illegal purpose.

22) In April of 2003, Robinson was again invited to S.S.'s home, where he surprised her with a home pregnancy test. S.S. refused to take the test. Her refusal, coupled with the fact that the allegedly four months pregnant woman showed no signs of being pregnant, only served to increase Mr. Robinson's concern that he was the victim of an illegal scheme.

23) Shortly thereafter, S.S. appeared at Mr. Robinson's place of work after business hours and offered to take a pregnancy test. She refused to allow Mr. Robinson to observe the test, and presented him with test results that indicated both "positive" and "negative."

24) In May of 2003, S.S. told Mr. Robinson that she had suffered a miscarriage.

25) Mr. Robinson then told S.S. that he did not want to have any further relationship with her.

26) S.S then told Mr. Robinson that she had not had a miscarriage and that she wished to continue the relationship.

27) In June of 2003, S.S. told Mr. Robinson that she planned to have an abortion. Mr. Robinson volunteered to accompany S.S. to the hospital for the abortion. Mr. Robinson made plans to take personal leave time from his work for that purpose.

28) Later in June, S.S. left a telephone message for Mr. Robinson, stating that she had had the abortion and that all their personal issues were resolved.

29) Still later in June, S.S. left a telephone message for Mr. Robinson, informing him that she has not had an abortion. S.S. said that she intended to travel to Iran to have the baby, and reiterated her

demands for Mr. Robinson's social security number, passport, birth certificate and other identifying information.

30) All the foregoing further exacerbated Mr. Robinson's concern that S.S. intended to use his identifying information for an illegal purpose. Mr. Robinson contacted the Fraud Unit of the Department of State. He was told that there was "nothing that could be done" unless S.S was "caught in the act."

31) In June of 2003, S.S. began to harass Mr. Robinson at his work. S.S. left as many as 10 rambling messages per day on Mr. Robinson's work cell phone number. The messages informed Mr. Robinson that S.S. was traveling back and forth between Iran and the United States. The messages also repeated S.S.'s demands that Mr. Robinson provide S.S. with his identification documents.

32) Shortly after S.S. began to leave messages on his work cell phone, Mr. Robinson informed his supervisor, Julie Salcedo, of S.S.'s harassing telephone calls.

33) Salcedo authorized Mr. Robinson to change his work cell phone number in order to prevent further harassment, which Mr. Robinson did.

34) S.S then began to leave numerous messages on Mr. Robinson's work telephone. Mr. Robinson saved many of these recorded messages. He was unable to save all the messages because there were simply too many to save.

35) Copies of these recorded messages were provided to the government in the course of the administrative investigation into this matter (detailed below).

36) Mr. Robinson had attempted on numerous occasions to obtain proof of pregnancy from S.S. S.S. had repeatedly resisted providing this information. Out of frustration, on approximately June 25, 2003, Mr. Robinson left a note at S.S.'s residence. The entire text of the note was as follows: "[S.S.'s first name], Could you please give me the telephone number of the doctor you saw last week regarding our expected baby?"

37) S.S. responded to this note with threats. In a telephone message to Mr. Robinson, S.S. warned Mr. Robinson that Mr. Robinson's life would be "miserable' and that his life "will be one hell, more miserable." She threatened that "I will bring you on your knees, you understand?"

38) This message is included in the recorded messages that were provided to the government as part of the investigation into this matter (detailed below).

39) After months of abuse from S.S., Mr. Robinson now felt trapped. He decided to stand up to S.S.'s threats. He left a responsive message on S.S.'s telephone in which he parroted S.S.'s threat to "bring him on his knees." Mr. Robinson said that he would tell S.S.'s husband "the truth" (about the baby)

and that he would report her to immigration authorities because he believed that she may have "lied" to those authorities.

40) On July 3, 2003, S.S. left the United States for Iran, allegedly to have the baby. S.S. still had not provided any proof that she was pregnant. Smith indicated that she intended to remain in Iran until the expected delivery which (if the baby existed at all) would be October, 2003.

41) Even though she was ostensibly in Iran, S.S. continued to leave several telephone messages per day on Mr. Robinson's work telephone. In these messages, S.S. repeatedly asked for Mr. Robinson's identifying information.

42) On October 12, 2003, S.S. returned from Iran She claimed to have given birth to a boy, named after Mr. Robinson. She indicated that she had left the newborn baby behind in Iran. S.S. again asked Mr. Robinson for his identifying information, ostensibly to get the baby out of Iran.

43) In November of 2003, Mr. Robinson decided that he had endured enough abuse at the hands of S.S. He sought the approval of his supervisor, Julie Salcedo, to obtain a Temporary Restraining Order against S.S. Salcedo not only gave her approval, but advised Robinson to keep his firearm with him at all times as protection against "S.S." Mr. Robinson subsequently sought and obtained a Temporary Restraining Order from the Alameda County Superior Court.

44) At about this same time, Mr. Robinson contacted the Department of State for the second time and expressed his concern that Smith was planning to use his identifying information for an illegal purpose. He was again told that the State Department would take no action unless S.S. was "caught in the act."

45) In January of 2004, S.S. left a voice mail for Mr. Robinson offering him money to assist her in getting her baby out of Iran.

46) In February of 2004, S.S. claimed that she intended to return to Iran because the child was ill. She claimed that her relatives had departed Iran for Europe and that there was no one in Iran who could care for the child.

47) In February of 2004, S.S. was served with Mr. Robinson's Temporary Restraining Order.

48) On April 23, 2004, S.S. complained to OEE officials, charging Mr. Robinson with, among other things, extortion, rape, threatening to kill S.S. and her family, and "black male." The administrative investigation of these allegations was assigned to agents John Wanat ("Wanat") and John McKenna ("McKenna").

49) Shortly thereafter, Mr. Robinson and S.S., through counsel, entered into a stipulated order. The order included mutual stay-away orders, and required S.S. to withdraw all her allegations against Mr. Robinson.

50) On May 28, 2004, S.S's counsel transmitted a letter to McKenna withdrawing all S.S.'s allegations against Mr. Robinson, asserting that S.S. and Mr. Robinson had settled all their personal differences, and requesting that all investigation of Mr. Robinson cease.

51) On June 11, 2004, the Alameda County Superior Court entered a stipulated order imposing mutual "stay away" conditions on S.S. and Mr. Robinson and requiring S.S. to withdraw her allegations against Mr. Robinson, which she had already done.

### The Administrative Investigation

52) Between April 23, 2004 and November 3, 2004, Wanat and McKenna conducted an administrative investigation into S.S.'s allegations.

53) Mr. Robinson fully co-operated in the investigation. Wanat and McKenna interviewed Mr. Robinson twice, once in San Francisco on June 1, 2004 and again on September 28, 2004 in Washington, D.C.

54) One component of the investigation concerned the Treasury Enforcement Communications System (TECS). TECS is a database operated by the United States Treasury Department. TECS is used by law enforcement in its investigations. Investigators can use TECS to, among other things, determine when a particular person has entered or left the United States.

55) Wanat and McKenna alleged in their investigative report that Mr. Robinson told them that had accessed TECS to determine whether S.S. had entered or left the United States "approximately 10 to 15 times."

56) On November 3, 2004, Wanat and McKenna filed their investigative report. The report is remarkable in that, while it mentions every fact that could be damaging to Mr. Robinson, it <u>omits</u> every fact that would tend to show that his actions were both legal and justified. For example:

   (a) The report emphasized the numerous "allegations" made by S.S. and includes the written statements of those allegations that were provided by S.S. The report fails to mention, however, that S.S. withdrew <u>all</u> those allegations in writing within days of making them, and fails to include the letter from S.S. attorney to McKenna in which the allegations were withdrawn.

   (b) The evidence provided in the report was arranged so as to create the appearance that Mr. Robinson was "stalking" S.S., when, in fact, the evidence that the investigators

-6-

had in their possession showed that it was the other way around: S.S. was, in fact, "stalking" Mr. Robinson. Specifically:

(i) The report includes transcripts of Mr. Robinson's voice mail message to S.S. in which he parrots S.S. earlier threat to "bring him on his knees."

(ii) Yet the report fails to include a transcript, or, indeed any mention whatsoever, of the original threat to Mr. Robinson. Thus, the report creates the false appearance that Mr. Robinson issued the first threat, when, in fact, he was simply responding to S.S.'s threat.

(iii) The report includes the only angry message that Mr. Robinson left with S.S., the message that he left only after S.S. pushed him to his emotional breaking point.

(iv) The report fails to mention S.S.'s months of "stalking" Mr. Robinson:

1. The report does not mention that Mr. Robinson had, with his supervisor's approval, changed his work cell phone number because of S.S.'s harassment;

2. The report does not mention that S.S. left up to 10 messages per day on Mr. Robinson's work phone, despite the fact that the investigators knew this, had recordings of some of the conversations, and were able to corroborate this fact through Mr. Robinson's co-workers;

3. The report does not mention that Mr. Robinson sought and obtained a Temporary Restraining Order and a permanent stay away order against S.S. naming Mr. Robinson as the protected person;

4. The report does not mention that Mr. Robinson's supervisor advised Mr. Robinson to carry his firearm "24/7" as protection against Smith;

57) In their report, McKenna and Wanat "focused" on the allegation that Mr. Robinson had improperly accessed the TECS system to inquire about S.S. The report concluded that the use was "unauthorized." Again, the report included all the information would make it appear that Mr. Robinson's use of the TECS system was unauthorized, but excluded all the facts that would have shown that Mr. Robinson's use of the system was "authorized." Specifically:

(i) As an investigator for OEE, Mr. Robinson is authorized to conduct investigations that are "necessary and incidental" to the enforcement of the Export Administration Act or the Export Administration Regulations.

(ii) Mr. Robinson's job description allows him to initiate such an investigation "on suspicion" of any violation of the Act or Regulations;

-7-

(iii) It appears that there was such an investigation initiated as to "S.S."

(iv) It appears that this investigation was conducted with the knowledge, approval and active participation of Mr. Robinson's supervisor.

(v) In fact, it appears that Mr. Robinson's supervisor issued at least one administrative subpoena in the course of this investigation. This subpoena seeks private information, including both Mr. Robinson's telephone records and the telephone records of a third party, and information concerning unlisted telephone numbers.

(vi) The purpose of the subpoena appears to have been the acquisition of records of S.S.'s telephone calls to the designated telephone numbers.

(vii) The subpoena alleged that it was issued as part of "an investigation" that is "necessary and incidental to the enforcement of the Export Administration" Regulations" and names Mr. Robinson as the agent to whom the subpoenaed materials are to be delivered.

58) On November 23, 2004, Mr. Robinson received notice that he would be terminated from his employment. The decision to terminate him was based upon the Wanat/McKenna report. The primary allegation against Mr. Robinson concerned his alleged "unauthorized" use of TECS

59) Mr. Robinson appealed to the Merit Services Protection Board (MSPB) but the agency's decision was upheld.

### The Criminal Investigation

60) The matter was also referred to the Department of Commerce's Office of the Inspector General (OIG). The criminal investigation was conducted by Agent Christopher Paige. Again, Paige relied primarily upon the investigative report prepared by Wanat and McKenna.

61) Paige concluded, based upon the Wanat/McKenna report, that Mr. Robinson's access to TECS had been unauthorized.

62) Paige also obtained a record of Mr. Robinson's queries of TECS regarding Smith and her family. He discovered that such queries had been made approximately 163 times.

63) Although it is now alleged that the exact number of queries was "material" to the Wanat/McKenna investigation, Wanat and McKenna never bothered to find out that exact number. Mr. Robinson's estimate of the number of queries was treated as a confession during the administrative proceedings and was the most damning evidence against him. He received the maximum penalty that he could have received-termination-based upon that evidence.

64) On September 19, 2007, Mr. Robinson was indicted on two counts. Count One alleges a false statement to government investigators (18 USC section 1001). This count is based upon the alleged statement that Mr. Robinson accessed TECS "approximately 10 to 15 times" in connection with his investigation of S.S. Count Two alleges unauthorized access of a government database for a tortious or criminal purpose (18 USC 1030(a)(2)(B) and (c)(2)(B)(ii).

65) The "tortious or criminal" purpose consists of "stalking" S.S. in violation of California Penal Code section 646.9.

**The Defense Investigation Thus Far**

66) Defendant has conducted an independent investigation of the case and has received significant discovery from the government. The defense investigation is by no means complete. Moreover, the defense investigation has suggested that the government is in possession of additional exculpatory evidence that has yet to be produced to the defense, and that will be the subject of additional informal discovery requests. With that caveat, however, the information thus far uncovered by the defense suggests the following:

a) That information in possession of the government at the time of the indictment suggests that Mr. Robinson's alleged "unauthorized" access to TECS was in fact part of an investigation in which his supervisor actively participated.

b) That Mr. Robinson neither committed nor intended to commit the crime of "stalking" in violation of California Penal Code Section 646.9. Specifically:

   i) "Stalking" requires "harassment." Cal. Penal Code section 646.9(a). Harassment consists of "course of conduct." Cal. Penal Code section 646.9(e) and (f). A single act, such as the single phone message alleged in the indictment, cannot constitute "harassment."

   ii) Moreover, Mr. Robinson's alleged threats all consisted of constitutionally protected activity. He "threatened" only to go to the police, to report to immigration authorities, and to tell S.S.'s husband "the truth." A stalking charge cannot be base on constitutionally protected activity. Cal. Penal Code section 646.9(f).

c) That Mr. Robinson's alleged statement to Wanat and McKenna that he had accessed TECS "approximately 10 to 15 times" was, as a matter of law, not "material" to Wanat and McKenna's investigation as it must be in order to form the basis for a charge under 18 USC 1001. Specifically:

-9-

      i) The statement, which the government now claims was intended to be exculpatory, was inculpatory.

      ii) In fact, that statement was the most significant evidence <u>against</u> Mr. Robinson in the disciplinary proceedings and was sufficient to earn him the maximum penalty that could be imposed as result of those proceedings-dismissal from government service. An admission to the exact number or queries-even if Mr. Robinson had known the exact number-would have led to the same result.

d) Neither Wanat nor McKenna took notes of, or made any recording of, the interview in which the alleged statement took place. The government's case as to this charge thus depends entirely on the credibility of Wanat and McKenna. That credibility is lacking however, and the government knew, or should have known this to be the case at the time of the grand jury hearing. Specifically:

      i) Mr. Robinson is African-American

      ii) Wanat has been found on at least one occasion to be guilty of racial discrimination against African-Americans.

      iii) After meeting with Wanat, Mr. Robinson's supervisor warned him that Wanat was out to get Mr. Robinson.

      iv) The withholding of material, exculpatory evidence is part of a pattern of conduct on Wanat's part. In one investigation, Wanat investigated possible illegal exports. Commerce Department licensing official had preliminarily concluded that the exports were, in fact, legal. Wanat insisted that the licensing officials withhold their determination until the conclusion until after he obtained a conviction. Witnesses to this incident spontaneously described Wanat as an "asshole." His tactics toward the licensing officials was described as "browbeating" and "intimidation." Wanat allegedly said that, if the agents issued their determination, he would consider them to be "on the take." Wanat is said to have demanded that the licensing official withhold their determinations because the truth would make it more difficult to send the suspect "to jail" and because he "hated" the suspect. The target of the investigation was convicted, but was not jailed. Wanat demanded an investigation of the licensing officials after the investigation. The investigation exonerated the officials.

**Defendant's Need For Grand Jury Transcript**

67) Based on the foregoing, I believe that there is a basis for a motion to set aside the indictment on the following grounds:

(1) The government failed to produce evidence of each element of the charged crimes at the grand jury hearing. Specifically;

   (a) The government failed to produce evidence that Mr. Robinson's access to the TECS system was "unauthorized." (And, in fact, the government was in possession of evidence that showed that the conduct was authorized.)

   (b) The government failed to produce evidence that Mr. Robinson has a tortious or criminal purpose on the part of Mr. Robinson, as required by 18 USC 1030(c)(2)(B)(ii). Specifically, the government failed to produce any evidence that Mr. Robinson either committed or intended to commit "stalking" within the meaning of California Penal Code section 646.9. (And, in fact, the government was in possession of evidence that showed that S.S. was stalking Mr. Robinson, not the other way around.) The government failed to prove a "pattern of conduct" as required by section 646.9, and such conduct as was proved consisted of constitutionally protected activity, which, as a matter of law, cannot form the basis for a charge under section 646.9.

   (c) The government failed to produce any evidence that Mr. Robinson's alleged false statement to Wanat and McKenna was "material" to their investigation, as required by 18 USC section 1001. (And, in fact, the government was in possession of evidence that showed that the statement was not material.)

(2) The government misled the grand jury as to the applicable law. Specifically:

   (a) The government failed to advise the grand jury that a charge of "stalking" requires a "pattern of conduct" and that such a charge cannot be base upon a single incident/

   (b) The government failed to advise the grand jury that a charge of stalking cannot be based upon constitutionally protected activity.

   (c) The government failed to advise the grand jury that a violation of 18 USC 1001 requires a "material" false statement, and/or failed to advise the grand jury as to the definition of materiality.

(3) The government misled the grand jury as to the facts. Specifically:

(a) The government failed to inform the grand jury that Mr. Robinson's use of TECS was authorized, when, in fact, the government was in possession of evidence that suggested this to be the case.

(b) The government failed to advise the grand jury that Mr. Robinson was not "stalking" S.S. and that, in fact, S.S. was stalking Mr. Robinson. Particularly, the government failed to tell the grand jury that:

   (i) Mr. Robinson had been forced to change his telephone number several times to avoid S.S.'s harassing telephone calls;

   (ii) Mr. Robinson had been advised by his supervisor to carry a gun to protect himself from S.S.

   (iii) Mr. Robinson had sought and received a Temporary Restraining Order against S.S.

   (iv) That Mr. Robinson's allegedly threatening phone call was not a threat at all but a response to a threat from S.S. and that Mr. Robinson's remarks on parroted S.S. threats to him.

(c) The government failed to advise the grand jury that S.S. had withdrawn all her allegations against Mr. Robinson

(d) The government failed to advise the grand jury that Mr. Robinson's supervisor had issued at least one administrative subpoena in connection with S.S. and that that subpoena referred to an "investigation" that was "necessary and incidental to the enforcement of the Export Administration Regulations."

(4) The government misled the grand jury as to the credibility of the witnesses. Specifically:

(a) The government failed to advise the grand jury that S.S. had made outrageous and unsupported allegations against Mr. Robinson, including allegations of extortion, rape, "black male," and threats to kill her and her family, and that S.S. had subsequently recanted all those allegations in writing.

(b) The government failed to inform the grand jury that Wanat had a history of racist conduct against African-Americans, that Mr. Robinson is African-American and that Wanat had indicated that he was "out to get" Mr. Robinson.

(c) The government further failed to inform the grand jury that Wanat has, in the furtherance of his efforts to obtain convictions, used intimidation, browbeating and threats of prosecution in order to suppress exculpatory evidence.

68) Based upon the foregoing, it appears that there is a further basis for a motion to set aside the indictment, based the cumulative effect of all the foregoing violations. As set forth, it appears that the grand jury was induced to apply incorrectly stated law to false and misleading testimony derived from incredible witnesses. Had the grand jury been in possession of the facts, been properly instructed as to the law, and been apprised of the witnesses' lack of credibility, it likely would not have handed down an indictment. The prosecution's conduct in this case, in other words, represents a usurpation of the grand jury's function, and a violation of Mr. Robinson's Due Process right to have his fellow citizens determine whether he should face felony charges.

69) Defendant has a particularized need for the transcript of the grand jury transcript in that the grounds for any motion to set aside the indictment, as set forth above, will turn upon the precise wording of the testimony before the grand jury, the nature of the evidence offered to the grand jury, and the precise wording of the instruction the jurors received as to the law. None of that can be ascertained without a transcript of the proceedings.

70) Defendant's need for the grand jury transcript outweighs any interest in preserving grand jury secrecy. On the one hand, disclosure of the grand jury testimony may lead to an early resolution of the case, thus saving the defendant, the government and the court the time and expense of a jury trial and avoiding a manifest injustice. On the other hand, the prejudice to grand jury secrecy is minimal. The government has indicated that it intends to disclose the grand jury transcript two weeks before trial in any event. And, defendant is prepared to enter into a protective order limiting use of the transcript to that which is necessary to preparation of the defense.

71) Based on the foregoing, defendant respectfully requests that his motion to disclose the grand jury transcript be granted.

72) A proposed order accompanies this motion.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, except as to those matters set forth on information and belief, and as to those matters, I believe them to be true.

Executed on December 4, 2007 at Redwood City, CA.

_____
Dean E. Johnson